CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
9/16/2021
JULIA C. DUDLEY, CLERK
BY: s/ C. Amos
     DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RICKY DONNELL ABNER,<br><br>  *Defendant.* | CASE NO. 6:21-cr-00001<br><br>MEMORANDUM OPINION & ORDER<br><br>JUDGE NORMAN K. MOON |

On January 26, 2021, DEA agents executed a search warrant at the residence of Defendant Ricky Donnell Abner in Charlotte, North Carolina. Dkt. 1 ¶ 25; Dkt. 133 at 1; Dkt. 174 at 1. Law enforcement discovered six firearms and what appeared to be a kilogram of cocaine; they also found a vehicle on the premises with a hidden compartment containing two more kilograms of cocaine. Dkt. 1 at 10. Law enforcement detained Abner in handcuffs during the search, and he admitted to storing drugs for Jermel Storey. Dkt. 1 ¶ 27. After obtaining an arrest warrant via criminal complaint from the Western District of Virginia, law enforcement placed Abner under arrest. Dkt. 149 at 7.

Abner filed a motion to suppress statements he made to law enforcement officers while handcuffed and detained in his house during the execution of the search warrant. Dkt. 133. The Government opposes the motion. Dkts. 149, 181. Abner argues that his confession should be suppressed because he was not given warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), before making self-incriminating statements to law enforcement. Dkt. 167 at 2. The Government maintains that Abner was *Mirandized* before law enforcement took his statements. Dkt. 181 at 1–2.

Having considered the full record, including evidence provided at a suppression hearing, the Court concludes that the Government has established by a preponderance of the evidence that law enforcement did not obtain Abner's statements in violation of *Miranda*. Accordingly, the Court will deny Abner's first motion to suppress based on a Fifth Amendment violation, and Abner's post-arrest statements will be admissible at trial.

## I. LEGAL STANDARD

Whether Abner's confession should be suppressed based on a violation of his Fifth Amendment right against self-incrimination hinges on when law enforcement informed him of those rights under *Miranda*. In his reply memorandum supporting his first motion to suppress, Abner maintains that law enforcement did not provide him with *Miranda* warnings "until he had incriminated himself in response to agents' questions," and that none of his statements are therefore admissible. Dkt. 167 at 3. The Government disputes this, asserting that law enforcement "properly advised [Abner] of his rights, pursuant to *Miranda*" and "then interviewed him." Dkt. 149 at 2, 4.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., Amend. V. To safeguard this right, the Supreme Court "adopted a series of procedural rules that must be followed during custodial interrogations" in *Miranda*, 384 U.S. at 444. "A confession made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under *Miranda*[,] . . . and the defendant knowingly, intelligently, and voluntarily waives those rights." *United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017).

Under certain circumstances, a defendant's "initial, unwarned statements [may] render[] involuntary the statements [the defendant] made *after* receiving and waiving *Miranda* rights."

*United States v. Mashburn*, 406 F.3d 303, 306 (4th Cir. 2005). If a law enforcement officer "intentionally withhold[s] *Miranda* warnings from suspect, question[s] the suspect until securing a confession; then obtain[s] a waiver of *Miranda* rights from the suspect and cover[s] the same material using leading questions," *id.* at 307 (citing *Missouri v. Seibert*, 542 U.S. 600, [] (2004) (plurality opinion)), then "postwarning statements related to the substance of the prewarning statements must be excluded unless curative measures are taken before the postwarning statements are made," *id.* at 309 (citing *Seibert*, 542 U.S. at 2616 (Kennedy, J., concurring in the judgment)). But if a law enforcement officer's failure to convey *Miranda* warnings to the defendant before asking questions was not deliberate or intentional, then "[t]he admissibility of postwarning statements is governed by" *Oregon v. Elstad*, 470 U.S. 298 (1985). *Mashburn*, 406 F.3d at 309. In *Elstad*, the Supreme Court held that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" regarding any postwarning statement. *Mashburn*, 406 F.3d at 309 (quoting *Elstad*, 470 U.S. at 314). Instead, "the relevant inquiry is whether, in fact, the second statement was also voluntarily made." *Id.* (quoting *Elstad*, 470 U.S. at 318).

Generally, the defendant moving to suppress evidence bears the burden of proof. *See United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981). "Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence." *United States v. Gualtero*, 62 F. Supp. 3d 479, 482 (E.D. Va. 2014) (citing *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974)). Thus, when a defendant moves to suppress his statements on the basis that the statements were obtained in violation of *Miranda*, "the government bears the burden of

establishing by a preponderance of the evidence that the statement was not obtained in violation of *Miranda*." *United States v. Jones*, No. 3:17-cr-71, 2018 WL 935396, at *19 (E.D. Va. Feb. 16, 2018) (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)).

## II.   EVIDENCE AND FINDINGS OF FACT

"Motions to suppress fall into the class of issues that are decided by the court and not the jury," and "[i]n the course of deciding a motion to suppress, the district court may make findings of fact." *United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir. 2005). *See also* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record.").

### 1.  Summary of Evidence

Abner testified that police officers entered his house in Charlotte "well before 7" in the morning, when "it was still dark outside." Dkt. 249 at 9:12–25, 10:1–3. Lynchburg City Police Department ("LPD") Detective Jonathan Howard testified that from his location on the "right side back of the house," he heard officers knock and announce at 7:03 and breach and enter the front door at 7:04. *Id.* at 25:21–25, 26:1.

Abner testified that he walked downstairs, where officers "immediately placed [him] in handcuffs" and took him into the living room. *Id.* at 10:8–14. He sat on the couch and asked one of the officers, whose name he did not recall, "What is this about?" *Id.* at 10:16–2, 11:1–5. The officer told him to wait and that everything would be explained shortly. *Id.* When Abner commented on the officer's badge, the officer asked him, "You don't know anybody in Virginia?" *Id.* at 11:15–18. Abner denied knowing anyone in Virginia or that he had ever been to Virginia. *Id.* at 11:18–21. Without reading him his *Miranda* rights, the officer told Abner, "Well,

4

you know somebody in Virginia. Something is going on. . . . Somebody has got you in a world of mess." *Id.* at 11:21–25, 12:1–3.

Abner then testified that an officer eventually read him his *Miranda* rights. *Id.* at 12:6. But before an officer read him his *Miranda* rights, Abner told an officer that he "knew Mr. Storey." *Id.* at 13:15–16; 14:4–10. Abner testified that the officer "went outside, spoke with another officer, came back in, and showed me a picture of Mr. Storey on his phone." *Id.* at 12:18–19. Abner testified that he "looked at the picture" and "started shaking [his] head." *Id.* at 12:24–25. When the officer said, "So now you remember?" Abner responded, "I know him. . . . I know who that person is." *Id.* at 12:25, 13:1–2. The officer then asked him, "You know anything about any murders or any violence like that?" *Id.* at 13:7–8. Abner denied knowledge of murders or violence. *Id.* at 13:8–10. Abner testified that the officer "called the prosecutor" and then told Abner "how much time" he would face on criminal charges. *Id.* at 13:19–23. Abner admitted that he "knew [Storey] from the club," *id.* at 14:16–17, and that "[Storey] had left something at [Abner's previous] house and [Abner's] house got broken into," *id.* at 15:3–8. Abner testified several times that he spoke with officers for "about maybe 30 minutes" before he received *Miranda* warnings. *Id.* at 18:5, 19:14–22, 21:6–16.

Detective Howard testified that an agent came out of the house and told him that the house was clear at 7:08. *Id.* at 26:4–7. Detective Howard, whose "role was to go in and speak with Mr. Abner," testified that he entered the house around 7:12 and observed Abner sitting on the couch in the living room, handcuffed. *Id.* at 26:12–20. LPD Detective Hendricks was standing with Abner at the time. *Id.* at 26:22.

Detective Howard testified that, although he knew in advance of executing the search warrant that he would be responsible for interviewing Abner, his body worn camera ("BWC")

5

was not functioning at the time of the search because he failed to turn off the fully-charged BWC after removing it from the charging dock and the BWC ran out of power. *Id.* at 34:22–25, 35:1–25, 36:1–14. As a result, Detective Howard's BWC did not record his interactions with and interview of Abner. *Id.*

Detective Hendricks's BWC captured some of Detective Howard's interactions with Abner. *See* Dkts. 240-1, 240-2. In one excerpt from Detective Hendricks's BWC footage from January 26, 2021, at timestamp 7:12:42, Abner is seated on the couch in his living room. Dkt. 240-1. The video clip's audio begins recording at 7:13:09. *Id.* At 7:13:16, Detective Hendricks introduces himself to Abner. *Id.* At 7:13:25, Detective Howard enters the frame. *Id.* One of the detectives asks Abner, "Who else is here with you?" *Id.* The detectives then walk Abner over to a nearby table around 7:13:51. *Id.*

In another excerpt from Detective Hendricks's BWC footage, at timestamp 7:15:02, Abner is seated at the table with his hands cuffed behind his back. Dkt. 240-2. At 7:15:04, Detective Howard, who is also seated at the table facing Abner, is looking at the screen of a smartphone in his hand. *Id.* The smartphone screen appears to display lines of text. *Id.* The video clip does not contain any audio. *Id.* Detective Howard testified that, at that moment, he was "looking up the *Miranda* warnings to read to him, to Mr. Abner." Dkt. 249 at 32:4–5.

Detective Howard further testified that, although Detective Hendricks and Abner appeared to be talking in the first BWC excerpt, Detective Howard did not ask Abner any questions before he read Abner the *Miranda* warnings "around 7:15 when [Abner] s[a]t down." *Id.* at 39:11–25.

Detective Howard also testified that, although he made an audio recording of his interview with Abner on his smartphone, he "failed to record . . . the first five minutes of it on

[his] phone." *Id.* at 32:6–11; *see also id.* at 39:25, 40:1 (DETECTIVE HOWARD: "The recording did not start until six minutes into the interview."). An image displaying the data properties of the file containing the audio recording that Detective Howard made on his phone shows that the audio recording was one hour, twenty-seven minutes, and fifty seconds long. Dkt. 240-3; *see also* Dkt. 249 at 32:12–19, 33:7–23. The image also shows that the audio recording file was created on January 26, 2021 at 8:48 a.m. Dkt. 240-3. Detective Howard testified that the file was created when he stopped the recording. Dkt. 249 at 33:13–21. Based on this information, Detective Howard testified that he determined that he started his recording device at approximately 7:21 a.m. *Id.* at 33:22–25, 34:1–6.

Detective Howard testified that "around a week after" the search of Abner's house, *id.* at 48:4–5, he prepared a report that stated:

> At 0715 Hrs, Howard advised Abner of Miranda warning [sic] which he understood and wished to speak. Note, during this interview, Howard failed to record the first portion of the interview. During this interview, Abner spoke with Howard about his involvement with Jermel Storey. . . .
> Initially, after being advised of Miranda warning [sic], Abner was asked about any large sums of money, narcotics and firearms inside of his residence. . . .

Dkt. 240-4; *see also* Dkt. 249 at 45:11–12 (DETECTIVE HOWARD: "[I]n this initial interview report, it says that I failed to record the first portion of the interview."), 46:2–5 (similar).

Detective Howard's audio recording of the interview begins with the following exchange:

> DETECTIVE HOWARD: So, you . . . what you said, about, probably 4 ounces?
> ABNER: Mmhmm.
> DETECTIVE HOWARD: Something small?
> ABNER: Mmhmm.

Dkt. 241. The parties stipulated that the audio recording did not capture any *Miranda* warnings given to Abner. Dkt. 249 at 50:10–15.

At 1:43 on the audio recording, an officer tells Abner:

Just what's in this house… the conspiracy with that doesn't even matter. You honestly don't have a choice with it. I mean, so, just like he said, you know, even if you had your mandatory 35 years, and you're 40 now . . . If they put another 30 on you for conspiracy, then . . . it doesn't matter if it's 35 or 100, you know. That's the way I look at it personally, I don't know. And that's not, honestly, that's not what I'm trying to do here. He's our main goal here. And that's what he's wanting you to talk about, is him, his organization and everything. So, like, I'm kind of laying a baseline of how you guys met, you know, how'd y'all get . . . .

Around 4:23, Abner says:

Man, I don't know what he did in VA, but I know he got bodies and all types of sh*t in VA. I know them n*ggers down there in VA is petrified of him. . . . He done do some sh*it up here. He just did something couple months ago at a club. . . .

At 18:10, an officer tells Abner:

Hey, uh, not for nothing, man, I haven't been listening in on, you know, what you're telling these guys, what you're not telling them, what's your bullshit. I'm just gonna give you a really good piece of advice. You've been through the system. You know how it works. We've got you with 2 kilos out here, so—your other 2 keys, we've got those as well. So, you've got 3 keys on you right now, you've got dogs, you are absolutely f*cked, and I don't know how else to put it. You know how this works, so, all you can do, is go up right now. And you know what, there's no friends in this game. There's no brothers, there's no sisters, there's no boys, there's no whatever, because somebody fucked you, is how you end up gettin' it. So, um, best thing I can tell you right now, I would do everything you can, and that's no bullsh*t and lay it out there. 'Cause right now I'm not sure where you're going today or how things are gonna work out. But your cooperation and your honesty would probably help you quite a bit. So, you know, if you've got—if there's some things that you want to talk to these guys about, now sounds good 'cause I'm waitin' on a phone call that's gonna determine your fate for today. And, uh, I would jump on that train while it's stopped. Otherwise, you're going to miss your one and only opportunity.

### 2. Factual Findings

The Government has shown the following facts by a preponderance of the evidence:

1. Law enforcement officers entered Abner's residence at approximately 7:04 a.m.

2. By 7:12 a.m., Abner was seated on his living room couch with his hands cuffed behind his back. At that time, Detective Hendricks was sitting or standing near

8

    him, and he introduced himself to Abner. Detective Howard was also present in the living room.

3. At 7:13 a.m., Detectives Hendricks and Howard moved Abner to a nearby table.

4. Roughly a minute and a half later, at 7:15 a.m., Detective Howard and Abner were seated at the table. Detective Howard brought up the text of the *Miranda* warnings on his phone and read the warnings to Abner.

5. By the time the audio recording begins at 7:21 a.m., Abner has begun discussing his involvement in Storey's drug activities with the officers. The officers mention lengthy prison terms and emphasize that Abner will face better outcomes if he cooperates against Storey. Abner also mentions Storey's reputation for violence and others' fear of Storey.

### III. ANALYSIS

The Court's findings of fact reflect an irreconcilable hole in Abner's argument. Abner asserts that officers interrogated him for about thirty minutes before providing *Miranda* warnings. But only seventeen minutes passed between the time that the officers entered the home (7:04 a.m.) and the time that the recording begins (7:21), and it is uncontested that the officers gave the *Miranda* warnings at some point in this period. Because Mr. Abner's version of events is impossible to reconcile with the timeline established by the recording, the Court credits Detective Howard's testimony that the footage of him pulling up text on his phone at 7:15 was when he delivered the warnings.

    The Court finds no evidence that the officers' failure, if any, to convey *Miranda* warnings to Abner until about 7:15, after he allegedly made some initial statements to law enforcement, was deliberate or intentional. Approximately eight minutes elapsed between when law

enforcement officers entered Abner's residence and when Abner was seated on the couch, handcuffed, near Detective Hendricks. Three minutes later, Detective Howard administered *Miranda* warnings to Abner, who waived his rights. Even if Detective Hendricks or another officer elicited some incriminating statements from Abner regarding his involvement in Storey's criminal activity during the eleven minutes before Abner received *Miranda* warnings, the Court cannot conclude that the officers employed a deliberate "question first" strategy here.

Because the officers' failure to convey *Miranda* warnings to Abner until 7:15 was neither deliberate nor intentional, *Elstad* governs the admissibility of his postwarning statements. *Mashburn*, 406 F.3d at 309. Under *Elstad*, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." *Mashburn*, 406 F.3d at 309 (quoting *Elstad*, 470 U.S. at 314). Instead, "the relevant inquiry is whether, in fact, the second statement was also voluntarily made." *Id.* (quoting *Elstad*, 470 U.S. at 318). Here, Abner's statements were voluntarily made; there is no evidence that the officers employed coercive or improper tactics in obtaining any of his statements. Thus, the officers did not violate the Fifth Amendment while interrogating Abner, and the evidence of his confession is admissible at trial.

### IV. CONCLUSION

For these reasons, Abner's motion to suppress his confession, Dkt. 133, will be **DENIED**.

It is so **ORDERED**.

The Clerk of Court is directed to send this Memorandum Opinion and Order to all counsel of record.

Entered this 16th day of September, 2021.

                                                  NORMAN K. MOON
                                                  SENIOR UNITED STATES DISTRICT JUDGE